IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARY BETH JONES,                §
                                §
        Plaintiff,              §
                                §
v.                              §       CIVIL ACTION NO. H-13-1221
                                §
CAROLYN W. COLVIN,              §
ACTING COMMISSIONER OF THE      §
SOCIAL SECURITY ADMINISTRATION, §
                                §
        Defendant.              §

## AMENDED MEMORANDUM OPINION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Cross-Motion for Summary Judgment (Doc. 10).  The court has considered the motions, the responses, the administrative record, and the applicable law.  For the reasons set forth below, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claims for disability insurance benefits and for supplemental security income under Titles II and XVI of the Social Security Act ("the Act").

## A. Medical History

---

[1]   The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docs. 7, 8.

Plaintiff was born on February 13, 1966, and was forty-one years old on the date of the alleged onset of disability.[2] Plaintiff has a high school education and last worked full-time as a customer service liaison for her husband's company in 2007.[3]

Plaintiff's medical records reflect that Plaintiff has a history of degenerative disc disease ("DDD") dating back to 2001 that caused continuing pain and she had been taking Wellbutrin for depression since 1999. Plaintiff claimed that her chronic lower back pain and radicular-type pain in her legs became so severe that it impeded her daily activities.[4] Her symptoms became intolerable and she underwent surgery for spondylolisthesis at the Northwest Spine Center in May 2008.[5]

Plaintiff had a magnetic resonance imaging scan ("MRI") interpreted by Jeffrey Watts, M.D., ("Dr. Watts") in November 2008 that showed degenerative changes of the spine.[6] The MRI revealed broad posterior disc protrusion at C3-C4, greatest at the left of midline, and there was cord contact with narrowing of the central canal and mild to moderate narrowing of the left foramen.[7] The

---

[2]   See Tr. of the Admin. Proceedings ("Tr.") 226.

[3]   See Tr. 62.

[4]   See Tr. 22.

[5]   See id.

[6]   See Tr. 270-71.

[7]   See id.

exiting left C4 nerve may have been compromised causing left C4 radiculopathy, according to the report.[8]  At C4-C5, the scan showed broad posterior disc protrusion with thecal sac effacement and mild narrowing of the central canal.[9]  At C5-C6 and C6-C7, the scan showed broad posterior disc protrusion with foraminal involvement and mild narrowing of the central canal at C5-C6 (without overt narrowing at C6-C7) and moderate narrowing of the foramina at both levels.[10]  The exiting C6 and C7 nerves may have been compromised, according to Dr. Watts, causing multilevel bilateral radiculopathy.[11]

Plaintiff began to experience a new type of pain in her lower back and began seeing Jack Chapman, M.D., ("Dr. Chapman") of Woodlands Pain Management in 2008.[12]  Plaintiff underwent several epidural steroid injections in the cervical and lumbar spine.[13]

Terry Bagley, M.D., ("Dr. Bagley") examined Plaintiff in July 2009 for her chronic neck and back pain.[14]  Plaintiff complained of pain in her mid-back area below her shoulder blades, but above

---

[8]     See id.

[9]     See id.

[10]    See id.

[11]    See id.

[12]    See Tr. 273.

[13]    See id.

[14]    See Tr. 334.

3

the L1, grading it as a "9-10/10" aching pain.[15]  Her lower back
pain, she said, was an aching, burning, stabbing pain with
radicular symptoms down her right leg.[16]  She had some numbness in
her left arm, according to Plaintiff, and she experienced a
stabbing pain in her neck.[17]  A physical examination showed that her
range of motion in her lumbar spine was decreased to about thirty
to forty percent of normal movement with flexion and extension.[18]
Dr. Bagley observed that Plaintiff was able to toe-and-heel walk
with difficulty and her cervical range of motion was decreased by
fifteen to twenty percent.[19]  He noted that her reflexes were absent
at the knees and ankles and that her straight leg raise was
positive.[20]  She exhibited high paraspinal pain in the lumbar and
thoracic regions, according to Dr. Bagley's notes, and there was
tenderness over the incision midline.[21]  Dr. Bagley observed tight
bands with active trigger points and tenderness in her bilateral
trapezius muscles.[22]

     In August 2009, Aileen Lee, M.D., ("Dr. Lee") evaluated

---

[15]     Tr. 334.

[16]     See id.

[17]     See id.

[18]     See Tr. 263.

[19]     See id.

[20]     See id.

[21]     See id.

[22]     See id.

Plaintiff's mental health for disability determination.[23] Plaintiff alleged DDD, depression, numbness in left hand and fingers, and pain in her back, neck, and shoulders.[24]   Dr. Lee opined that Plaintiff's depression appeared driven by situational stress and that Plaintiff appeared quite overwhelmed.[25] Dr. Lee further stated that Plaintiff would need a psychological intervention to address the psychological component of her pain status if she were ever to return to the work arena.[26] Plaintiff was diagnosed with Chronic Pain Disorder associated with both psychological factors and medical conditions with a global assessment functioning ("GAF") of fifty.[27]

## B. **Application to Social Security Administration**

Plaintiff filed for disability insurance benefits and for supplemental security income on May 22, 2009, claiming an inability to work due to a disorder of the spine that causes chronic pain.[28]

In a disability report that Plaintiff completed near the time of her application, Plaintiff stated that she was five-feet-four-

---

[23]     See Tr. 372-76.

[24]     See id.

[25]     See id.

[26]     See id.

[27]     See Tr. 375. A GAF of 50 indicated serious symptoms or serious impairment in social or occupational functioning. DSM-IV-TR, p. 34.

[28]     See Tr. 160, 168.

inches tall and weighed 104 pounds.[29]   She described the work
limitations caused by her back surgery in this way:

> "[One] of the pins used for bone fusion has left me
> with severe pains in the pin area. It[']s painful
> to drive and sit. Degenerative disc disease. . .
> cause[s] severe pain which makes it difficult to
> stand for a long time. Bulging disc in neck causes
> pain and sharp aching in shoulder mak[ing] it
> difficult to do work for long periods. All of these
> conditions limit my ability to lift and carry. The
> pain in my neck and shoulder is so severe sometimes
> it causes unbearably painful muscle cramping in my
> neck and numbness in my left hand and fingers,
> which limits my ability to sit at desk for long
> periods of time. The crushing pain in my mid back
> is so bad after being on my feet for long periods
> that it makes me depressed."[30]

Her medications at the time were Flexeril, Lidocaine patch,
Norco, and Wellbutrin.[31]   Plaintiff reported severe fatigue as a
side effect of Flexeril and occasional nausea or drowsiness as a
side effect of Norco.[32]

Plaintiff stated that her daily activities included showering
and making a simple breakfast for herself and her husband; making
a lunch for her husband and daughter; waking her daughter and
helping her get dressed for school; occasionally doing chores such
as laundry, cleaning the dishes, paying bills online, or shopping
at the grocery store; taking her two children to school; eating

---

[29]   See Tr. 180.

[30]   Tr. 181.

[31]   See Tr. 191.

[32]   See id.

lunch; picking up her children from school; fixing a simple dinner
for the family; and getting her daughter ready for bed.[33]

With regard to her physical abilities, Plaintiff reported that
she could not lift a gallon of milk with one hand without pain,
could not bend or stand for periods over thirty minutes due to
numbness in her right leg or pain in her left foot, could not reach
without pain, and could not sit for long periods of time without
pain.[34] She stated that depression made completing tasks difficult
and had caused her to stop most outside social interaction, except
for Sunday visits to church.[35]

Mikhail Bargan, M.D., ("Dr. Bargan") completed a Physical
Residual Functional Capacity ("RFC") assessment in August 2009.[36]
This assessment reflected that Plaintiff was capable of frequently
lifting ten pounds, standing or walking for at least two hours in
an eight-hour workday, sitting for about six hours in an eight-hour
workday, and unlimited pushing or pulling.[37] Dr. Bargan further
opined that Plaintiff could occasionally climb a ramp/stairs,
stoop, kneel, crouch, or crawl, and could frequently balance.[38] He

---

[33]    Tr. 217.

[34]    Tr. 222, 224.

[35]    Tr. 222.

[36]    See Tr. 377-84.

[37]    See Tr. 378.

[38]    See Tr. 379.

cited DDD as the partial basis for her limitations, but stated that Plaintiff can do activities of daily living ("ADLs") fairly well.[39]

David Yandell, Ph.D, ("Dr. Yandell") completed a mental RFC in August 2009.[40] Dr. Yandell determined that Plaintiff was suffering from Chronic Pain Disorder with both psychological factors and medical condition.[41] Dr. Yandell determined that the disorder mildly limited ADLs and Plaintiff's ability to maintain concentration, persistence, or pace; it also moderately limited her ability to maintain social functioning.[42] With regard to Plaintiff's mental RFC, Dr. Yandell determined that Plaintiff was not significantly limited in the areas of understanding and memory or sustaining concentration and persistence.[43] As far as social interaction, Dr. Yandell opined that Plaintiff was moderately limited in the ability to interact appropriately with the general public and to get along with coworkers or peers, but Plaintiff was not significantly limited in the ability to ask simple questions or request assistance, to accept instruction and respond to criticism from supervisors, or to maintain socially appropriate behavior and

---

[39]    See Tr. 382.

[40]    See Tr. 385.

[41]    See Tr. 391.

[42]    See Tr. 395.

[43]    See Tr. 399.

adhere to basic standards of neatness and cleanliness.[44] As far as adaptation, Dr. Yandell stated Plaintiff was moderately limited in the ability to respond appropriately to changes in the work setting and the ability to set realistic goals or make plans independent of others, but Plaintiff was not significantly limited in awareness of normal hazards, taking appropriate precautions, or the ability to travel to unfamiliar places or use public transportation.[45]

Defendant denied Plaintiff's application at the initial and reconsideration levels.[46] Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration. The ALJ granted Plaintiff's request and conducted a hearing on May 19, 2011.[47] No testimony was given at this hearing because the Plaintiff appeared without counsel. Another hearing was requested and conducted on December 23, 2011.[48]

## C. December 23, 2011 Hearing

Plaintiff and Karen Nielsen ("Nielsen"), a vocational expert, testified at the hearing.[49] Plaintiff testified that her last job

---

[44]  See Tr. 400.

[45]  See id.

[46]  See Tr. 1-3.

[47]  See Tr. 41.

[48]  See Tr. 50.

[49]  See id.

was a graphic design project in September 2011.[50] She reported that the last time she held a full-time job was in 2007 when she worked as liaison for her husband's company, but that she left when the company downsized due to the economy.[51]

As far as her medical condition, Plaintiff testified that she had "chronic pain in [her] lower back, [her] mid back, and also [her] neck" that had become a problem after her son was born in 1999.[52] She stated that the pain became unbearable in 2008 and as a result, she had to have bone-fusion surgery for DDD in May 2008.[53] She said that the surgery stopped specific leg pains, but started other pains, such as in her mid-back resulting from the pin placed in her lower back during surgery.[54] Plaintiff testified that she conducted her own post-surgery physical therapy due to expense.[55]

Plaintiff claimed that her pain level at the time of the hearing was "a ten," despite her use of pain medications such as Morphine and Lyrica, which did not address all of her pain.[56] Plaintiff said she had been recently referred from her chronic pain

---

[50]   See Tr. 56-60.

[51]   See Tr. 62.

[52]   Tr. 65.

[53]   See Tr. 66.

[54]   See id.

[55]   See Tr. 67. Dr. Amed is mentioned in the administrative record only at the hearing during Plaintiff's testimony. See id. The court cannot find any medical records attributed to him.

[56]   Tr. 68.

doctor, Dr. Chapman, whom she had been seeing since 2008, to a new doctor, "Dr. Amed."[57] Plaintiff speculated that Dr. Chapman stopped seeing her because he had been prescribing her the maximum amount of pain medication and did not want to continue to do so.[58] Plaintiff stated that Dr. Amed recommended aquatic therapy sessions to her, which she began, until she could no longer afford a membership at the health club where she was doing the therapy.[59] She stated that the aquatic therapy helped her to feel stronger, but did not negate her pain.[60] Plaintiff stated that she then began yoga at her house three times a week as a form of therapy.[61]

As far as her mental health, Plaintiff testified that she had been depressed since 1999, and had taken Wellbutrin, an anti-depressant, continuously since that date.[62] Plaintiff saw several therapists for her mental condition when she lived in Arizona in 2009 and started visiting a therapist in Texas one or two times a month in September 2011, which she reported, "helps a little bit."[63]

Plaintiff also stated that she had foot bunion surgery on both feet in 2010 that caused her feet to become more painful than they

---

[57]   See Tr. 70.

[58]   See id.

[59]   See Tr. 72.

[60]   See id.

[61]   See Tr. 73.

[62]   Tr. 74.

[63]   Tr. 75.

were before.[64]  Plaintiff stated that she wore orthopedic devices in her shoes, which gave her some relief.[65]  She claimed that she could sit for thirty to forty-five minutes, could lift a gallon of milk with two hands, could walk about thirty minutes, and could stand for about twenty to thirty minutes.[66]

As she listed in her social security application, Plaintiff reported that her daily routine included getting up, taking her daughter to school, trying to do physical therapy or eat breakfast, picking her daughter up from school and helping her with homework, trying to fix a simple dinner, and getting her children ready for bed.[67]  She testified that she was able to let the dog in and out during the day, do a little laundry and fold towels, and check her email.[68]  She claimed that she could no longer grocery shop or do many of the household cleaning chores.[69]

Plaintiff expressed interest in jewelry design and creation, but stated that she could not concentrate long enough to make anything due to either pain or depression.[70]  Plaintiff moved from Texas to Arizona and back to Texas within the last three years for

---

[64]    See Tr. 77.

[65]    See Tr. 81.

[66]    See id.

[67]    See Tr. 83.

[68]    See id.

[69]    See id.

[70]    See Tr. 84.

her husband's job, but she had not traveled out of the state of Texas since returning.[71]   Plaintiff claimed that she had trouble going to social events because of anxiety.[72]

Having reviewed the record and having heard Plaintiff's testimony, Nielsen categorized Plaintiff's prior work as an artist as sedentary and skilled and her work as a customer sales representative, or public affairs liaison, as sedentary and semi-skilled.[73]   The ALJ asked Nielsen about vocational opportunities for a hypothetical person with the exertional ability to lift ten pounds; stand or walk for at least two hours of an eight-hour workday; sit for at least six hours of an eight-hour workday; pull and push; occasionally use the stairs; occasionally bend, stoop, crouch, crawl, balance, twist, and squat; get along with others; understand detailed instructions; concentrate and perform detailed tasks; and respond and adapt to workplace changes and supervision.[74]   Nielsen responded that a person with these skills could perform Plaintiff's prior work as an artist or customer sales representative.[75] Nielsen testified that Plaintiff's customer service skills were transferable to a job as a front desk

---

[71]   See Tr. 86-87.

[72]   See Tr. 91.

[73]   See Tr. 93.

[74]   See Tr. 94.

[75]   See Tr. 95.

13

clerk, who might be required to make plans or reservations, schedule, maintain inventory, control personnel, greet, manage transportation, perform light bookkeeping, answer the phone, and file.[76]  Nielsen stated that there were many positions like this available regionally and nationally.[77]

The ALJ then asked Nielsen to change the hypothetical person's abilities by limiting her to simple tasks.[78]  Nielsen responded that this change would negate the ability to perform Plaintiff's past work, but that other jobs, such as a jewelry designer or order clerk, would meet that skillset and were available regionally and nationally.[79]

In response to Plaintiff's attorney's questioning, Nielsen stated that the ALJ's hypothetical person would be eliminated from competitive employment if that person was off task more than fifteen to twenty percent of the time due to pain or side effects of medication.[80]

**D. Commissioner's Decision**

On February 10, 2012, the ALJ issued a partially favorable decision finding that Plaintiff was disabled from the period of

---

[76]    See Tr. 97.

[77]    See Tr. 96.

[78]    See Tr. 97.

[79]    See Tr. 98.

[80]    See Tr. 100.

December 9, 2007, to December 10, 2009, after which she medically improved and was no longer qualified as disabled.[81]  The ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period and that she had multiple impairments (DDD with musculoskeletal pain, depression, and headaches) that were severe.[82]

The ALJ also decided that Plaintiff's severe impairments, individually or collectively, did not meet or medically equal any of the disorders described in the listings of the regulations[83] (the "Listings").[84]  Specifically, the ALJ found that Plaintiff had not met or equaled Listing 1.04 (disorders of the spine) because, though Plaintiff had DDD, Plaintiff "lack[ed] the requisite motor and sensory deficits."[85]  The ALJ also considered Listing 11.01 (neurological impairments) and Listing 12.04 (affective disorders).[86]

In determining Plaintiff's RFC to perform work-related activities, the ALJ considered the entire record.[87]  The ALJ found

---

[81]   See Tr. 12-33.

[82]   See Tr. 19.

[83]   20 C.F.R. Pt. 404, Subpt. P, App. 1.

[84]   See Tr. 20.

[85]   Tr. 20.

[86]   See id.

[87]   See Tr. 21.

15

Plaintiff capable of sedentary work.[88]  However, the ALJ found that Plaintiff was unable to perform these work-related activities on a sustained basis for a significant period of time and was unable to perform any past relevant work for a period of time before December 11, 2009.[89]  The ALJ also found that there were no jobs that existed in significant numbers in the national economy that fit Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was under a disability from December 11, 2007, through December 10, 2009.[90]

Next, the ALJ applied the medical improvement test. Beginning December 11, 2009, the ALJ found that Plaintiff had not developed any new severe impairments and her existing impairments still did not meet or equal any Listing.[91]  In determining that there was medical improvement, the ALJ relied on objective medical evidence related to Plaintiff's ability to work.[92]  Specifically, the ALJ found that Plaintiff's RFC had increased to a sustained, sedentary level with the abilities to occasionally lift and/or carry ten pounds and frequently five pounds, stand and/or walk for at least two hours in an eight-hour workday, sit for at least six hours in

---

[88]   See id.

[89]   See Tr. 23-24.

[90]   See Tr. 25.

[91]   See Tr. 27.

[92]   See Tr. 28.

an eight-hour workday, push/pull without limitation, except in the lower extremities, occasionally climb stairs, bend, stoop, crouch, crawl, balance, twist, and squat.[93]  The ALJ found Plaintiff could not climb ladders, ropes, scaffolds, or run, and could tolerate only limited exposure to heights, machinery, and uneven surfaces.[94] The ALJ found that Plaintiff had the mental capacity to get along with others, understand detailed instructions, concentrate and perform detailed tasks, and respond and adapt to workplace changes and supervision.[95]

The ALJ decided that Plaintiff's ADLs after December 10, 2009, did not support the level of alleged severity after her initial back surgery.[96]  Further, the ALJ stated that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible because of their inconsistency with the other record evidence, such as Dr. Bargan's RFC assessment.[97]  The ALJ relied on several pieces of medical evidence in the record to show that Plaintiff's pain was becoming more stable, including: a series of progress reports from 2010 indicating that her medication regimen was stabilizing her chronic pain, her discharge from

---

[93]    See id.

[94]    See id.

[95]    See Tr. 29.

[96]    See id.

[97]    See id.

physical therapy to an at-home program in August 2011, her GAF assessment in the normal range of sixty to seventy in July 2011, and Dr. Gilliland's mental RFC assessment in June 2010.[98]

Relying on the vocational expert's testimony that a hypothetical individual with Plaintiff's RFC after December 10, 2009, would be able to perform her past work as a customer service representative, a designer, and an artist, the ALJ found Plaintiff not to be disabled starting December 11, 2009.[99]

Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[100] Plaintiff then timely sought judicial review of the decision by this court.

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A. Legal Standard

In order to obtain disability benefits, a claimant bears the

---

[98]    See Tr. 29-31.

[99]    See Tr. 31-32.

[100]   See Tr. 1-6.

ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. §§ 423(d)(3), (d)(5)(A); <u>see also</u> <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) A claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520, 416.920. The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B. Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).   It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.   42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).   In other words, the court is to defer to the decision

of the Commissioner as much as is possible without making its
review meaningless. Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to
deny disability benefits. Defendant argues that the decision is
legally sound and is supported by substantial evidence.

Plaintiff asserts that the ALJ's decision contains the
following errors: (1)(a) The ALJ erred in finding that Plaintiff
did not meet or equal Listing 1.04; (1)(b) The ALJ erred in failing
to acknowledge Plaintiff's supporting medical evidence; (2) The
ALJ erred in not obtaining a medical expert opinion on the issue of
medical equivalence; (3) The ALJ erred in improperly applying the
medical improvement test when determining whether Plaintiff's
disability had ended; (4)(a) The ALJ erred in improperly concluding
that Plaintiff's symptoms were exaggerated based on ADLs; (4)(b)
The ALJ erred in using selected testimony to support conclusions,
despite finding that Plaintiff's testimony was not wholly credible.

The court will address these issues as they arise logically
from the ALJ's decision.

### A. Listing 1.04

To meet the criteria for Listing 1.04(A) under Step Three of
the sequential process, Plaintiff bears the burden of providing
objective medical evidence to prove the following:

Plaintiff has a disorder of the spine, such as herniated

nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, DDD, facet arthritis, or vertebral fracture, that results in a compromise of a nerve root or spinal cord, *as well as* evidence of nerve root compression characterized by:

    (1)   neuro-anatomic distribution of pain;

    (2)   limitation of motion of the spine;

    (3)   motor loss (atrophy with associated muscle weakness or muscle weakness);

    (4)   accompanied by sensory or reflex loss; and

    (5)   if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. § 404, Subpt. P., App. 1 § 1.04. If these conditions are met, the sequential process is concluded and the claimant is found disabled without any further analysis of vocational factors. See Greenspan, 38 F.3d at 236.

The crux of the issue before the court is not whether substantial record evidence shows that Plaintiff met the requirements of Listing 1.04(A), but rather, whether there is substantial record evidence supporting the ALJ's determination that Plaintiff's impairments did not meet a Listing. In this case, Plaintiff has provided evidence in the record showing the following symptoms on or before December 10, 2009: (1) Plaintiff had DDD, supported by an MRI administered by Dr. Watts with disc bulges at

T4-T5 and disc protrusions at T6-T7 and T7-T8;[101]   (2) Plaintiff's
spinal cord was compromised, supported by the disc protrusion at
T7-T8, which "flattens the ventral surface of the cord;"[102]   (3)
Plaintiff had a neuro-anatomic distribution of pain, supported by
Dr. Bagley's July 2009 consultation record;[103]   (4) Plaintiff had
limited degrees of motion in flexion, extension, right rotation,
left rotation, right lateral flexion, and left lateral flexion,
supported by Dr. Eason's November 2010 range of motion exam;[104]   (5)
Plaintiff suffered motor loss in the form of weakened muscle
strength, supported by Dr. Eason's November 2010 muscle strength
exam;[105]   (6) Plaintiff suffered sensory or reflex loss in her knees
and ankles, supported by Dr. Bagley's July 2009 consultation
record;[106]   and (7) Plaintiff's leg raise was mildly positive on the
right, supported by Dr. Bagley's July 2009 consultation record.[107]

The ALJ stated that the Plaintiff did not meet Listing 1.04(A)
from December 11, 2007 through December 10, 2009, simply repeating
the regulatory language that "claimant lacks the requisite motor

---

[101]   See Tr. 262.

[102]   See id.

[103]   See Tr. 334.

[104]   See Tr. 264.

[105]   See Tr. 265.

[106]   See Tr. 335.

[107]   See Tr. 263.

and sensory deficits."[108]   The ALJ discussed no evidence in connection with this determination, cited no agency medical expert, and gave no reason as to why the above-listed evidence was not proof of motor and sensory deficits.   Consequently, the court cannot determine what evidence the ALJ relied on to support his conclusion.   "Although it is not always necessary that an ALJ provide an exhaustive discussion of the evidence, bare conclusions, without any explanation for the results reached, may make meaningful judicial review of the Commissioner's final decision impossible." Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007).

Here, the problem with the ALJ's conclusion that Plaintiff's impairment did not meet or equal Listing 1.04 is that it is not supported by substantial evidence by way of an explanation or by citation to evidence in the medical record.   Substantial evidence supports an ALJ's bare conclusion at Step Three *only* when the plaintiff fails to demonstrate the specified medical criteria.   Cf. Selders v. Sullivan, 914 F.2d 614, 619 (5th Cir. 1990).

Though the ALJ erred at Step Three for failing to provide substantial evidence for his conclusion that Plaintiff did not meet Listing 1.04, remand is necessary only if Plaintiff's substantial rights have been affected. See Hurtado v. Astrue, No. H-07-3486, 2008 WL 3852361, at *3 (S.D. Tex. Aug. 15, 2008) Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in

---

[108]    Tr. 20.

administrative proceedings is not required" as long as "the substantial rights of a party have [not] been affected."); Hurtado v. Astrue, No. H-07-3486, 2008 WL 3852361, at *3 (S.D. Tex. Aug. 15, 2008). To be entitled to relief, Plaintiff must establish that the ALJ erred and that the ALJ's error might have altered the result. Hurtado, No. H-07-3486, 2008 WL 3852361, at *3; Mays, 837 F.2d at 1364.

Because the court finds that Plaintiff demonstrated specified medical criteria to support a finding that she met Listing 1.04 from December 9, 2007 through December 10, 2009, a medical expert's opinion on equivalence was not necessary and thus, Plaintiff's second argument is moot.  The court moves to Plaintiff's argument concerning the application of the medical improvement test.

## B. The Medical Improvement Test

When determining whether disability benefits continue after a recent favorable finding, the Commissioner must determine whether substantial evidence supports a finding of medical improvement in the claimant's impairment, and, if so, whether this medical improvement is related to the claimant's ability to work.  20 C.F.R. §§ 404.1594, 416.994; see also 42 U.S.C. § 423(f); Griego v. Sullivan, 940 F.2d 942, 943-44 (5th Cir. 1991). The regulations define medical improvement as "any decrease in the medical severity" of the impairments that were present at the time of the most recent finding of disability or continued disability. 20

25

C.F.R. §§ 404.1594, 416.994.

In determining whether medical improvement is related to the claimant's ability to do work, the Commissioner will compare both the medical severity of the impairment and the claimant's RFC at the time of claimant's last favorable medical decision with her current condition. 20 C.F.R. §§ 404.1594, 416.994. The regulations outline eight steps to follow in making the determination whether disability continues. See 20 C.F.R. §§ 404.1594, 416.994. The steps reassess whether: (1) claimant engaged in substantial gainful activity; (2) claimant has an impairment or combination of impairments which meet or equals a listed impairment; (3) claimant experienced medical improvement; (4) the medical improvement is related to the claimant's ability to work; (5) if no medical improvement is found or is not related to claimant's ability to work, whether there are any exceptions to the medical improvement standard of review; (6) claimant's current impairments, in combination, are severe; (7) claimant can perform past relevant work; (8) claimant can do other work. Id.

The starting point for comparison in the medical improvement test is the medical severity of the impairment when Plaintiff was last found disabled. 20 C.F.R. §§ 404.1594, 416.994. In this case, had the ALJ determined that Plaintiff met or equaled Listing 1.04, the starting point for comparison would be Step Two, where the symptoms of her qualifying back injury under Listing 1.04 would

be evaluated.  The eight-step test would proceed from that point and involve a comparison between her symptoms in 2007-2009 and those after December 10, 2009, with precise explanations of any changes between the state of the impairment when Plaintiff met the Listing and the subsequent state of impairment.  Because of the ALJ's previous error in failing to provide substantial evidence for his conclusion that Plaintiff did not meet Listing 1.04, and therefore dismissing it, he skipped over this comparison at Step Two of the medical improvement test.

Defendant argues that it is "irrelevant" whether Plaintiff met or equaled Listing 1.04 prior to December 11, 2009, because Plaintiff was later found disabled anyway.[109]  The error is not irrelevant because it caused the medical improvement test to be incorrectly applied and, thus, opened the door for a potential change in result.

However, in this case, the court finds that the result did not change.  Despite the ALJ's errors in the Listing 1.04 analysis and the misapplication of the medical improvement test, the court finds that there is sufficient evidence in the medical record to conclude that Plaintiff did medically improve under the proper application of the medical improvement test.  Specifically, the court relies on the November 2009 physical exam from Verde Valley Medical Center[110]

---

[109]    Doc. 12, Def.'s Response to Pl.'s Mot. for Summ J. p. 2.

[110]    See Tr. 449.

and the June 2010 physical exam by Dr. Ligon.[111]  An examination of
these records shows that Plaintiff had no reported musculoskeletal
symptoms at the time of these appointments and that her motor
strength, reflexes, and sensation had all returned to within normal
limits.  Because these symptoms had improved from the time that she
had met the Listing, Plaintiff would no longer meet or equal
Listing 1.04.  The medical improvement test would then move on to
follow the same analysis that the ALJ detailed in his decision, and
the ALJ made no error in that analysis.  In support of his
decision, the ALJ cited progress reports and ADLs in finding that
Plaintiff's RFC improved to a sustained, sedentary level.  At this
RFC, the ALJ found Plaintiff capable of performing past relevant
work that existed regionally and nationally.  As of December 11,
2009, medical improvement had occurred, and Plaintiff was no longer
disabled.

## C. **The ALJ's Use of Evidence**

In cases where there is a mixed record concerning health
problems and work-related limitations, the "ALJ's findings
regarding the debilitating effect of the subjective complaints are
entitled to considerable judicial deference." James v. Bowen, 793
F.2d 702, 706 (5th Cir. 1986).  The ALJ properly recited Plaintiff's
testimony and weighed it against the objective medical evidence.
Specifically, the ALJ compared Plaintiff's testimony about her ADLs

---

[111]   See Tr. 518.

(she was able to drive, practice yoga, do small household chores, and attend art activities and church) with her alleged limited ability to function and found the testimony and RFC evaluations inconsistent. Considering the medical record as a whole, there is substantial evidence to support the ALJ's credibility findings with respect to Plaintiff's ADLs and subjective testimony.

**D. <u>Summary</u>**

Because the court arrives at the same conclusion of medical improvement after December 11, 2009, the results are the same under both this court's analysis and the ALJ's decision. The ALJ's errors did not alter the result and therefore, the court cannot overturn the decision.

### IV. Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Cross-Motion for Summary Judgment.

**SIGNED** in Houston, Texas, this <u>31st</u> day of July, 2014.

_____
U.S. MAGISTRATE JUDGE

29